F. Gregory MURPHY, Plaintiff,

v.

Gerald R. FORD, as President of the United States, Defendant.

Civ. A. No. M–74–141.

United States District Court,
W. D. Michigan, N. D.

March 28, 1975.

Shumar & Murphy, Marquette, Mich., (Peter H. Shumar, Marquette, Mich., of counsel), for plaintiff.

Frank S. Spies, U. S. Atty., Grand Rapids, Mich., for defendant.

OPINION

FOX, Chief Judge.

The plaintiff, F. Gregory Murphy, is an attorney residing in Marquette, Michigan. The defendant is Gerald R. Ford, President of the United States.

The plaintiff seeks a declaratory judgment that the unconditional pardon of Richard M. Nixon by President Ford on September 8, 1974, is void and of no effect. The plaintiff contends, among other things, that the pardon could not be validly granted to a person who had never been indicted or convicted and who had therefore never been formally charged with an offense against the United States. The plaintiff also alleges that the pardoning of Mr. Nixon creates a system of unequal enforcement of the laws and has substantially increased the

likelihood of non-compliance with the criminal justice system.

The plaintiff has filed a motion to join the special prosecutor as a party defendant in this case.

The United States Attorney, as amicus curiae, has moved the Court to dismiss the case.

The court observes that the Pardoning Power is in the same section of the Constitution which makes the President Commander-in-Chief of the armed forces.

Article II, Section 2, of the United States Constitution provides, "The President . . . shall have Power to *grant* Reprieves and Pardons for Offenses against the United States, except in Cases of Impeachment." (Emphasis supplied.)

In granting a pardon to Mr. Nixon, President Ford was not presuming to end the impeachment proceeding then pending in Congress. That was exclusively a Congressional affair. The impeachment exception to the Pardoning Power does not apply here.

■■ The main issue is, did President Ford have the constitutional power to pardon former President Nixon for the latter's offenses against the United States?

In The Federalist No. 74, written in 1788 in support of the proposed Constitution, Alexander Hamilton explained why the Founding Fathers gave the President a discretionary power to pardon: "The principal argument for re-posing the power of pardoning . . . [in] the Chief Magistrate," Hamilton wrote, "is this: in seasons of insurrection or rebellion, there are often critical moments, when a well-timed offer of pardon to the insurgents or rebels may restore the tranquillity of the commonwealth; and which, if suffered to pass unimproved, it may never be possible afterwards to recall." [1]

Few would today deny that the period from the break-in at the Watergate in June 1972, until the resignation of President Nixon in August 1974, was a "season of insurrection or rebellion" by many actually in the Government. Since the end of 1970, various top officials of the Nixon Administration at times during this period deliberately and flagrantly violated the civil liberties of individual citizens and engaged in criminal violations of the campaign laws in order to preserve and expand their own and Nixon's personal power beyond constitutional limitations. When many illegal activities were threatened with exposure, some Nixon Administration officials formed and executed a criminal conspiracy to obstruct justice. Evidence now available suggests a strong probability that the Nixon Administration was conducting a covert assault on American liberty and an insurrection and rebellion against constitutional government itself, an insurrection and rebellion which might have succeeded but for timely intervention by a courageous free press, an enlightened Congress, and a diligent Judiciary dedicated to preserving the rule of law.[2]

1. At 79 (E. Bourne ed. 1947).

2. (a) Egil Krogh, a former member of the White House "Plumbers' Unit," was sentenced November 30, 1973 by Judge John Sirica. At that time he told Judge Sirica: "The sole basis for my defense was to have been that I acted in the interest of national security. However, upon serious and lengthy reflection, I now feel that the sincerity of my motivation cannot justify what was done and that I cannot in conscience assert national security as a defense.

. . . . .

"I feel that what was done in the Ellsberg operation was in violation of what I perceive to be a fundamental idea in the character of this country, the paramount importance of the rights of the individual . . . .

. . . The victims of this crime in California, Dr. Fielding and Dr. Ellsberg, both of them, were deprived of rights to which they were entitled . . . .

Dr. Fielding . . . always cherished his privacy, which because of this act, he lost. The American people, many of them, have been confused; many have been disturbed by what took place in 1971; and it has raised many doubts, many questions about what the country represents and what it means. Those doubts and those questions probably never

Certainly the summer and early fall of 1974 were a period of popular discontent, as the full extent of the Nixon Administration's misdeeds became known, and public trust in government virtually collapsed. After Mr. Nixon's resignation in August, the public clamor over the whole Watergate episode did not immediately subside; attention continued to focus on Mr. Nixon and his fate. When Mr. Ford became President, the executive branch was foundering in the wreckage of Watergate, and the country was in the grips of an apparently uncontrollable inflationary spiral and an energy crisis of unprecedented proportions.

Under these circumstances, President Ford concluded that the public interest required *positive steps to end the divisions caused by Watergate and to shift the facus of attention from the immediate problem of Mr. Nixon to the hard social and economic problems which were of more lasting significance.*

By pardoning Richard Nixon, who many believed was the leader of a conspiratorial insurrection and rebellion against American liberty and constitutional government, President Ford was taking steps, in the words of Alexander Hamilton in The Federalist, to *"restore the tranquillity of the commonwealth"* by a *"well-timed offer of pardon"* to the putative rebel leader. President Ford's pardon of Richard M. Nixon was thus within the letter and the spirit of the Presidential Pardoning Power granted by the Constitution. It was a prudent public policy judgment.

The fact that Mr. Nixon had been neither indicted nor convicted of an offense against the United States does not affect the validity of the pardon. Ex parte Garland, 4 Wall. (71 U.S.) 333, 18 L.Ed. 366 (1867). In that case the Supreme Court considered the nature of the President's Pardoning Power, and the effect of a Presidential pardon. Mr. Justice Field, speaking for the court, said that the Pardoning Power is *"unlimited,"* except in cases of impeachment. "[The Power] extends to every offense known to the law, and may be exercised *at any time after its commission, either before legal proceedings are taken,* or during their pendency, or after conviction and judgment . . . . The benign prerogative of mercy reposed in [the President] cannot be fettered by any legislative restrictions.

"Such being the case, the inquiry arises as to the effect and operation of a pardon, and on this point all the authorities concur. A pardon reaches both

would have been raised but for this action in California, which I approved.

"I also would like to tell you how serious I feel the action which took place was. In contrast to Watergate and other political activities, the actions of the Special Investigations Unit, the Plumbers, represented official Government action. As official Government action, as I have come to see it, it struck at the heart of what that Government was established to protect, which is the individual rights of each individual."

(b) Charles Colson, former advisor to President Nixon, on June 3, 1972, before Judge Sirica sentenced him, told Judge Sirica: "Your Honor's words from the bench . . . , that if this is to be a government of laws and not of men, then those men entrusted with enforcing the law, whatever their motives, must be held to have intended the natural and probable consequences of their acts, had a profound effect on me.

My motives and my purpose in seeking to disseminate derogatory and adverse information about Dr. Ellsberg and his lawyer was to neutralize Dr. Ellsberg as an anti-war spokesman in Vietnam. It did not matter to me that Dr. Ellsberg was facing serious criminal charges . . . .

. . . I now know what it is like to be a defendant in a celebrated criminal case . . . .

I have come to believe in the very depths of my soul and my being that official threats to those rights such as those charged in this case must be stopped."

(c) The prosecution of persons, in and out of government, involved in "Watergate" related cases, is so notorious that any court can take judicial notice that 66 persons, including a Vice President, three Cabinet officers, two highly positioned aides in the Oval Office, presidential assistants, and others, were convicted by jury verdicts or pleas of guilty of high crimes and misdemeanors against the United States, and that the era of the immediate past President and his men was indeed a "season of insurrection and rebellion."

the punishment prescribed for the offense and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, . . . . If granted before conviction, it prevents any of the penalties and disabilities consequent from conviction from attaching; . . .

"There is only this limitation to its operation: it does not restore offices forfeited, or property or interests vested in others in consequence of the conviction and judgment." Id. at 380–381. (Emphasis supplied.)

However, " . . . as the very essence of a pardon is forgiveness or remission of penalty, a pardon implies guilt; *it does not obliterate the fact of the commission of the crime and the conviction thereof; it does not wash out the moral stain; as has been tersely said; it involves forgiveness and not forgetfulness.*" Page v. Watson, 140 Fla. 536, 192 So. 205, 208. (Emphasis supplied.)

For the above-stated reasons, plaintiff's motion to add the special prosecutor as a party defendant is denied.

The United States Attorney's amicus curiae motion to dismiss this action is hereby granted.